UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| GARY KEMPTON and RYAN DANIEL, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Civil Action No. |
| | ) | CLASS ACTION |
| Plaintiffs, | ) ) ) | COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT |
| vs. | ) ) | |
| REALPAGE, INC., GREYSTAR REAL ESTATE PARTNERS, LLC, LINCOLN PROPERTY COMPANY, FPI MANAGEMENT, INC., MID-AMERICA APARTMENT COMMUNITIES, INC., AVENUE5 RESIDENTIAL, LLC, EQUITY RESIDENTIAL, ESSEX PROPERTY TRUST, INC., THRIVE COMMUNITIES MANAGEMENT, LLC, and SECURITY PROPERTIES INC., | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

Plaintiffs Gary Kempton and Ryan Daniel (collectively, "plaintiffs"), individually and on behalf of all others similarly situated, bring this class action Complaint for Violations of the Sherman Antitrust Act (the "Action") 15 U.S.C. §1, for actual damages, treble damages, punitive damages, declaratory and injunctive relief, costs of suit, pre-and post-judgment interest, and other relief. Plaintiffs allege as set forth below.

**NATURE OF THE ACTION**

**"If you have idiots undervaluing [*i.e.*, independently determined rental prices], it**

**costs the whole system." – Jeffrey Roper, RealPage's main architect**

1.      Defendants, the nation's largest lessors of multifamily residential real estate leases ("Lessors"), operate a cartel which artificially inflates the prices of multifamily residential real estate in the United States above competitive levels. RealPage, Inc. ("RealPage," together with "Lessors," are "defendants") provides software and data analytics to Lessors and serves as the mechanism by which Lessors collude and avoid competition, increasing lease prices to plaintiffs and other members of the proposed Class (defined herein). RealPage openly boasts that its services "balance supply and demand to maximize [Lessors'] revenue growth." And that is precisely what RealPage has done, facilitating an agreement among participating Lessors not to compete on price, and allowing Lessors to coordinate both pricing and supply through two mutually reinforcing mechanisms in furtherance of their agreed aim of suppressing price competition for multifamily residential real estate leases.

2.      Prior to the conduct challenged herein, competitor Lessors like defendants here, competitively set leases for their multifamily residential housing rental properties according to market supply and demand dynamics. This included independent consideration of available properties in a given area and means of maximizing occupancy, such as lowering rents to attract lessees away from competitors. Thus, the market operated as a competitive market should, with multifamily residential housing leases reflecting available supply of and demand for such properties.

3.      In this market, Lessors typically favored a strategy of keeping "heads in the beds" (*i.e.*, maximizing physical occupancy levels in multifamily residential real estate properties). If any Lessor lowered rents while the others did not, that Lessor would prevail.

4.      No later than approximately 2016, Lessors replaced their independent pricing and supply decisions with collusion, using RealPage to collect real-time pricing and supply levels and then, using that data, to make unit-specific pricing and supply recommendations. Lessors also

agreed to follow these recommendations, on the understanding that competing Lessors would do the same.

5.    As detailed herein, instead of competing with each other as independent actors, Lessors "outsource[d] daily pricing and ongoing revenue oversight" to RealPage.  As part of the scheme, RealPage collects and aggregates current historical and contemporaneous pricing data from participating Lessors that is, according to RealPage, updated when participating Lessors enter into or alter lease renewal offers.  This data encompasses over "16 million units" – a "very large chunk of the total inventory in the country."  RealPage analyzes the data to address specific property characteristics and then establishes, using its algorithm, lease amounts for participating Lessors to charge lessees.  Under this practice, independent decision-making ceases.  RealPage admits this, trumpeting that it sets leases for "properties as though we own them ourselves."  Thus, consistent with the primary goal of all cartels, the multifamily residential rental housing market operates in the same fashion as it would if a single person or entity had a monopoly on these dwellings.

6.    To maintain control of the market, RealPage maintains discipline among participants. Participating Lessors are required to accept RealPage-set leases for properties at least 80% of the time, and rejecting a set lease amount is a rigorous process.  This, according to RealPage, is necessary to maximizing (*i.e.*, inflating) rents.  Accordingly, few participating Lessors act independently.  As one RealPage employee has explained, as many as 90% of prices are utilized by participating Lessors.  Putting it bluntly, while Lessors are competitors, RealPage "encourages rivals to work together."  ***This is collusion***.

7.    In coordination with participating Lessors, RealPage also manipulates the available supply of multifamily residential housing units.  Absent defendants' manipulations, supply would at times exceed demand and at other times demand would exceed supply.  This is the normal

functioning of a competitive market. When supply exceeds demand, market prices decline as competitors compete for the demand (*i.e.*, renters). RealPage, though, provides information and recommendations in order to "stagger" leases and, thus, control supply. Indeed, vacant rental units are purposefully left unrented with the intention of manipulating supply. Central to defendants' scheme is that participants sacrifice occupancy in order to increase rental income. By artificially decreasing supply, defendants manufactured artificially inflated rents.

8.     The results of defendants' scheme are simple: rents are artificially inflated and occupancy is decreased. Indeed, RealPage and its co-conspirators expect to see rent increases exceeding 5% across markets. And at least one participant admitted that "pushing [certain] people out" and raising multifamily residential housing rents resulted in "$10 million in income."

9.     This misconduct has hit the military community particularly hard. In addition to the real-world adverse effects that defendants' conduct has on renters nationwide, defendants' conduct also adversely affects America's military personnel, both active duty and veterans. For example, Fort Campbell straddles both Kentucky and Tennessee, and houses a large military base. According to a 2019 Tennessee Department of Economic & Community Development report entitled "Economic Impacts of Fort Campbell on the State of Tennessee" ("Tennessee Economic Impacts Report"), of the roughly 26,800 military personnel stationed at Fort Campbell, approximately 25,000 are "installation or Tennessee residents."[1] According to the same report, an estimated close to 4,000 civilian Fort Campbell employees also reside in Tennessee. Fort Campbell's "on-post" housing is at 96% capacity, and some families have to wait months to obtain a rental, depending on family size and availability. "Off-post" rentals are found to be too expensive, and while the U.S. Department of

---

[1]     *See Economic Impacts of Fort Campbell on the State of Tennessee*, Tenn. Dep't of Econ. & Cmty. Dev. (Feb. 2019), https://tnecd.com/wp-content/uploads/2019/02/Ft-Campbell-Economic-Impact-Analaysis_02-2019-1.pdf.

Defense provides a monthly basic allowance for housing, it is often insufficient to cover the costs of off-post housing. Many veterans also depend upon residential leases for their housing, often spending much of their household income on rent. According to the Tennessee Economic Impacts Report, an estimated 61,300 Fort Campbell veterans reside in Tennessee.

10.     In the face of the illegal and anticompetitive conduct alleged herein, one RealPage executive addressed recent residential rent increases, which reached increases of 14.5% in some locations, referring to the RealPage software that is at the core of defendants' scheme – "I think it's driving it, quite honestly."

11.     Plaintiffs and the Class have been harmed by defendants' conduct. Accordingly, plaintiffs, individually and on behalf of a Class of those similarly situated, seek damages, injunctive relief, and all other appropriate relief for defendants' wrongdoing.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337, as this action arises out of §1 of the Sherman Antitrust Act, 15 U.S.C. §1, and §§4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§15 and 26, because plaintiffs allege violation of federal law.

13.     This Court has personal jurisdiction over defendants under §12 of the Clayton Act, 15 U.S.C. §22.

14.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates or co-conspirators, may either be found in and transact business in the forum state, including the sale of multifamily residential real estate leases to members of the Class, and/or influence the transacting of business in the forum state, including the sale of multifamily residential real estate leases to members of the Class.

15.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of multifamily residential real estate leases.

16.     Venue is proper in this District pursuant to §12 of the Clayton Act, 15 U.S.C. §22, and the federal venue statute, 28 U.S.C. §1391, because one or more defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## PARTIES AND UNNAMED CO-CONSPIRATORS

**Plaintiffs**

17.     Plaintiff Gary Kempton is a citizen and resident of Nashville, Tennessee.  Mr. Kempton rented a multifamily residential unit in a property managed by Lessor defendant Greystar in Nashville, Tennessee during the Class Period.  Mr. Kempton has paid higher rental prices by reason of the violations alleged herein.

18.     Plaintiff Ryan Daniel is a citizen and resident of Nashville, Tennessee.  Mr. Daniel rented a multifamily residential unit in a property managed by Lessor defendant Lincoln in Nashville, Tennessee during the Class Period.  Mr. Daniel has paid higher rental prices by reason of the violations alleged herein.

**Defendants**

19.     Defendant RealPage, Inc. is a Delaware corporation headquartered in Richardson, Texas.  RealPage was a public company from 2010 until December 2020, when it was purchased by private equity firm Thoma Bravo LLC in a transaction that valued RealPage at approximately $10.2 billion.  RealPage provides software and services to the residential real estate industry, including as described herein.  RealPage has thousands of employees and earns over a billion dollars per year in revenue.  As of December 31, 2019, RealPage had over 29,800 clients, including each of the 10 largest multifamily property management companies in the United States.

20.     Lessor defendant Greystar Real Estate Partners, LLC ("Greystar") is a Delaware limited liability corporation headquartered in Charleston, South Carolina.  It is the largest manager

of multifamily rental real estate in the United States, with more than 782,900 multifamily units and student beds under management nationally. On information and belief, Greystar earns billions of dollars per year in revenue, controls $35.5 billion in assets, and employs over 20,000 people.

21.     Lessor defendant Lincoln Property Company ("Lincoln") is a Texas corporation headquartered in Dallas, Texas. Lincoln is the second largest manager of multifamily rental real estate in the United States, with over 210,000 multifamily units under management nationally. On information and belief, Lincoln earns billions of dollars per year in revenue and employs thousands of people.

22.     Lessor defendant FPI Management, Inc. ("FPI") is a California corporation headquartered in Folsom, California. FPI is the fifth largest manager of multifamily rental real estate in the United States, with over 150,000 multifamily units under management in 17 states. On information and belief, FPI earns billions of dollars per year in revenue and employs thousands of people.

23.     Lessor defendant Mid-America Apartment Communities, Inc. ("MAA") is a Tennessee corporation headquartered in Germantown, Tennessee. MAA is the tenth largest manager of multifamily rental real estate in the United States, with over 100,000 multifamily units under management in 16 states. On information and belief, MAA earns over $1 billion per year in revenue and employs over 2,400 people.

24.     Lessor defendant Avenue5 Residential, LLC ("Avenue5") is a Delaware limited liability company headquartered in Seattle, Washington. Avenue5 is the twelfth largest manager of multifamily rental real estate in the United States, with over 96,900 multifamily units under management in 12 states. On information and belief, Avenue5 earns over $500 million per year in revenue and employs over 1,000 people.

25.     Lessor defendant Equity Residential ("Equity") is a Maryland real estate investment trust headquartered in Chicago, Illinois.  Equity is the sixteenth largest manager of multifamily rental real estate in the United States, with over 80,000 units under management in 8 states.   On information and belief, Equity earns over $2 billion per year in revenue and employs over 2,000 people.

26.     Lessor defendant Essex Property Trust, Inc. ("Essex") is a Maryland corporation headquartered in San Mateo, California.  Equity is the twenty-fourth largest manager of multifamily rental real estate in the United States, with over 61,000 units under management in California and Washington.  On information and belief, Essex earns over $1.4 billion per year in revenue and employs over 1,700 people.

27.     Lessor defendant Thrive Communities Management, LLC ("Thrive") is a Washington Limited Liability Company headquartered in Seattle, Washington.  Thrive has over 18,000 units under management in the greater Pacific Northwest.  On information and belief, Thrive earns millions of dollars per year in revenue and employs over 500 people.

28.     Lessor defendant Security Properties Inc. ("Security Properties") is a Washington corporation headquartered in Seattle, Washington.  Security Properties has over 22,000 units under management in 18 states.  On information and belief, Security Properties earns millions of dollars per year in revenue.

29.     The Lessor co-conspirators are various persons and entities, including Lessors, known and unknown to plaintiffs and not named as defendants in this Action, who have participated as co-conspirators with RealPage and the Lessor defendants in the offenses alleged and have performed acts and made statements in furtherance of the conspiracy.

# FACTUAL ALLEGATIONS

**Relevant Market**

30.     Insofar as plaintiffs are required to plead the relevant product and geographic market to establish the antitrust violations alleged herein, plaintiffs allege the relevant market at issue and have pled how defendants' conduct has harmed competitive processes in this market.

31.     The relevant market in this Action is the market for the lease of multifamily residential real estate in the United States (the "Relevant Market").

32.     Millions of consumers depend on the lease of multifamily rental property for shelter and a home.  From the perspective of the consumer, multifamily rental apartment units are not an economic substitute for apartments, condominiums, or homes for purchase because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing.

33.     These consumers depend on competition among rental property owners and managers to drive cost competition/affordability, consumer choice, and quality of service.  Defendants know this.  Indeed, failure to effectively compete for renters creates a risk of significant adverse impacts on defendants' bottom line if their respective vacancy rates rise.  Empty rental property represents non-monetizable lost revenue.

34.     The Relevant Market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test."  The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist.  If the SSNIP is profitable, the market is properly defined.  If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

35.     Here, the SSNIP test is satisfied and the market is properly defined.  As described above and below, pursuant to defendants' agreement, consumers overpay hundreds of millions of dollars annually due to defendants' propensity to raise prices, throttle competition, and reduce consumer choice, and yet those increases have not driven enough consumers out of the market such that the SSNIP has become unprofitable to defendants.

**Geographic Market**

36.     In this Action, the Geographic Market is the entirety of the United States – as the anticompetitive effects of defendants' conduct can be felt throughout the country.

**Historical Multifamily Rental Housing Pricing Competition**

37.     In a competitive multifamily residential housing market, Lessors are incentivized to make every effort to gain the attention of prospective tenants, attracting them away from their competition with lower rent prices until all of their available space is occupied, thus maximizing occupancy.  Maximizing occupancy is also referred to as maximizing output.  Lessors act independently as they consider supply and demand, marketing decisions, target demographics, property values, amenities, and rents in an effort to secure tenants.  The primary goal is sometimes referred to as "keeping heads in the beds" and is historically considered a multifamily housing rental maxim, with anything less than 95% occupancy being considered a failure, according to at least one commentator.  Every day that a property is unleased represents lost and unrecoverable revenue.  Thus, in order to reach and maintain high occupancy levels, Lessors compete with each other for the available renter population by offering incentives such as attractive rents and rental terms, as well as enhancements such as, *inter alia*, desirable amenities and rent concessions (*e.g.*, free first month's rent, lower security deposits, and others).

38.     Indeed, prior to the unlawful conduct alleged herein, in making rent-pricing decisions, competing Lessors did not work in coordination and made independent pricing decisions, resulting

in price competition for tenants, again, with the goal being to maximize occupancy, which is a defining characteristic of a properly functioning market (vs. one that is characterized by collusive price-setting strategies). Such competition drives rent levels to reflect demand for rental units and the available supply of such units, which fluctuates in unpredictable fashion as Lessors independently control when leases are made available and is a natural function of a competitive market. In a competitive market, principles of supply and demand govern (*i.e.*, when demand is exceeded by supply, prices lower).

**Collectively Utilizing RealPage, Defendants Eliminated Competition**

39.     Commencing in or around 2016, Lessors stopped fairly competing through the above-described independent decision-making, choosing instead to collectively collude in pricing and supply decisions with RealPage, which utilized confidential as well as publicly available pricing and supply data to make controlled pricing and supply recommendations to supposedly competing Lessors who collectively agreed to follow RealPage's recommendations, turning competition into collusion and competitive pricing into price fixing. After RealPage entered the market, its participating Lessors quickly and collectively shifted from a competitive strategy focused on market share to a collusive strategy focused on price over volume, which is a common characteristic of pricing in a cartelized market.

40.     In short, RealPage uses property management software, in agreement with Lessors, to collect competitively sensitive and non-public real-time pricing and supply information from its property-manager clients, including what rents are charged and rental space availability. That information is fed into an algorithm that then recommends unit-specific rent prices daily for each available apartment. RealPage admits that in doing so it manipulates the natural functioning of supply and demand dynamics in the residential housing rental market by "balanc[ing] supply and demand to maximize [Lessor's] revenue growth." RealPage feeds its clients' internal rent data into

its pricing software, also giving its client Lessors an aggregated look at what their competitors nearby are charging. Moreover, by mutually agreeing to let RealPage control supply and fix rents charged by supposed competitors, Lessors suppress fair competition and increase the lease prices of multifamily housing units charged plaintiffs and the Class.

41.     To accomplish their scheme, Lessors' individual independent "daily pricing and ongoing revenue oversight" decision-making is outsourced to RealPage. RealPage gathers real-time data on historical and current pricing from participating Lessors, which is updated when participating Lessors enter into or alter lease renewal offers for over "16 million units," representing a "very large chunk of the total inventory in the country." This data is standardized to account for differences in property "class," and prices are set for participating Lessors using a common formula applied by RealPage's algorithm to a common dataset. RealPage claims to set prices for Lessors' "properties as though we own them ourselves" – in other words, the participating Lessors' cartel replicates the market outcomes of a multifamily residential housing lease monopolist.

42.     RealPage stresses the importance of discipline among participating Lessors. To encourage compliance with its common scheme, RealPage states that for its services to be most effective in raising rents, Lessors must accept the pricing at least 80% of the time. RealPage also makes rejecting its pricing determinations subject to difficult processes. For example, RealPage gives Lessors recommended prices every morning. Lessors must tell a RealPage Pricing Advisor if they accept the approved pricing within a specified time frame. If Lessors want to change the price, they must give a reason and wait for approval. RealPage encourages Lessors' pricing employees to talk to the Pricing Advisor every day. If there is disagreement, Lessor management must provide specific reasons therefor to RealPage.

43.     These efforts are highly successful.  One RealPage employee states that as many as 90% of prices are adopted by participating Lessors without any deviation.  With RealPage's algorithmic pricing, unlike in a fair and competitive market, participating Lessors are required to follow recommendations and not offer rental incentives or negotiate with renters.  In short, while Lessors are competitors, RealPage "encourages rivals to work together."

44.     RealPage also enables participating Lessors to coordinate supply levels to prevent price competition.  In a competitive market, there are times when supply exceeds demand, resulting in lower market prices as firms compete for tenants.  To avoid this, RealPage provides Lessors with information to "stagger" lease renewals and prevent oversupply.  Lessors may leave rental units vacant for periods of time to ensure that there is never an oversupply of residential properties for lease, keeping prices higher.  By staggering lease renewals to artificially balance supply and demand, RealPage and participating Lessors eliminate any incentive to undercut or cheat on the cartel.  RealPage's central principle is to sacrifice physical occupancy in exchange for "economic" occupancy, a term it uses to refer to increasing prices despite market conditions and tolerating decreasing occupancy in the market.  Using RealPage, Lessors can stagger lease expirations to reduce vacancy loss and avoid lowering prices.  By staggering lease renewals, Lessors can match demand and position themselves for increased rental income.

45.     Defendants have adopted a philosophy of economic occupancy.  Maximizing economic occupancy is only in a firm's self-interest if competitor Lessors do the same.  One industry executive explained that while all Lessors "would be better off limiting their rent reductions [discounts]," if any Lessor "lower[s] their rents while the others don't, than that [Lessor] would outperform."  To avoid this, RealPage and participating Lessors have agreed not to compete on price for multifamily residential real estate leases.  As described above, they have achieved this through

two mechanisms: setting prices using RealPage's coordinated algorithmic pricing and staggering lease renewal dates through RealPage to avoid oversupply of rental properties.

46.     RealPage helps Lessors collectively maintain higher prices by providing a way for them to coordinate, substantially increasing economic occupancy, meaning it causes higher prices and less output.   Another Lessor said that RealPage's "multifamily experts handl[e] revenue management for us, [and] essentially act like an extension of our team," adding "[RealPage] monitor[s] pricing and revenue performance at our sites daily, [and] collaborate[s] closely with each of our fee managers."   Another Lessor found that by focusing on price over volume, they made more money even with a higher turnover rate: "The net effect of driving revenue and pushing people out was $10 million in income."   That same Lessor concluded: "I think that shows that keeping the heads in the beds above all else is not always the best strategy."

**Defendants' Scheme Has Inflated Prices and Reduced Occupancy**

47.     RealPage executives admit that their coordinated algorithmic pricing has caused anticompetitive effects in the form of higher prices and reduced output.  As reported by *ProPublica* in an October 14, 2022 investigative article entitled "Rent Going Up?  One Company's Algorithm Could Be Why."("Rent Going Up?"):

> On a summer day last year, a group of real estate tech executives gathered at a conference hall in Nashville to boast about one of their company's signature products: software that uses a mysterious algorithm to help landlords push the highest possible rents on tenants.

> "Never before have we seen these numbers," said Jay Parsons, a vice president of RealPage, as conventiongoers wandered by.  Apartment rents had recently shot up by as much as 14.5%, he said in a video touting the company's services.  Turning to his colleague, Parsons asked: What role had the software played?

> "I think it's driving it, quite honestly," answered Andrew Bowen, another RealPage executive.

48.     RealPage touts that participating Lessors experience rent increases exceeding 5% across markets, the ability to "outperform[] the market 2%-5%," and "driv[e] additional yield up to 150-200 basis points" that would not otherwise be attainable to a Lessor utilizing independent competitive pricing, which RealPage refers to as "manual pricing."  RealPage claims to "outperform" manual pricing by 7% each year.  Stated differently, RealPage's claim is that its collusive pricing and output market manipulation succeeds in increasing prices above competitive levels by 7% each year.

49.     Given the open admissions of RealPage and its participating Lessors, it is clear that the price increases described herein would be not be economically rational (*i.e.*, against individual Lessors' economic self-interest) absent other Lessors' exercising pricing "discipline," that these price increases would not be attained absent the coordinated algorithmic pricing efforts of RealPage and its participating Lessors.

50.     One Lessor's representative explained that "[t]he beauty of using [RealPage's pricing] is that it pushes [Lessors] to go places that you wouldn't have gone on your own if you weren't using it."  Another Lessor's representative told panelists at an industry conference that it "raised rents hundreds of dollars," following RealPage's pricing direction, and noting that the Lessor would not have had "the courage to push [rents] as aggressively as [the RealPage pricing] program has."  Yet another admits that, in the natural state of play, it simply is "not in [a Lessor's] DNA to raise pricing $150 to $200 per unit on a lease turn," but following RealPage's coordinated algorithmic pricing allowed the Lessor to do what, independently, it would not.

51.     Indeed, a Lessor in Florida stated: "In our Florida markets . . . , we let the system push as hard as it would go, and we saw increases as high as 20 percent. . . . Left to our own devices, I can assure you we would have never pushed rents that hard.  That was a big number."

Significantly, in markets where conditions dictated lowering rents, a Lessor successfully raised rents with a consultant for that Lessor explaining: "If you'd listened to your gut, you would have lowered your price."

52.     RealPage itself also admits that these price levels could not be obtained independently.  Indeed, the company openly states: "We believe in overseeing properties as though we own them ourselves. . . .  We believe we can deliver better results for you than you would otherwise be able to achieve."  In short, RealPage concedes that its coordinated algorithmic pricing allows Lessors to obtain the same results as a single seller or monopolist – an outcome Lessors "would [not] otherwise be able to achieve" without RealPage's pricing and assurances of Lessors' discipline to that pricing.

**Numerous Plus Factors Exist Which Are Probative of Defendants' Antitrust Violations**

53.     In addition to the above allegations, other characteristics of the market make collusion particularly attractive.  Specifically, the market: (i) has high barriers to entry; (ii) has inelasticity of demand; (iii) is highly concentrated; and (iv) presents ample opportunities to collude.  Moreover, defendants have provided pretextual explanations for their conduct, have acted against their economic interest, and are the subject of multiple governmental investigations.

**High Barriers**

54.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing.  Where there are significant barriers to entry, however, new entrants are less likely to enter the market.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

55.     There are substantial barriers that preclude, reduce, or make entry more difficult into the multifamily residential housing rental market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with acquiring multifamily

residential housing property to rent, establishing and operating property management systems and operations, and maintaining competitive facilities and building maintenance. Acquiring multifamily rental properties can cost millions to hundreds of millions of dollars. Successfully operating them is likewise extremely costly. Maintaining a successful multifamily residential housing rental operation can take years to develop. New entrants, outside the existence of a cartel or other antitrust law violations, would be unlikely to have to ability to control market pricing.

56. In addition to the costs of building, acquiring, and then operating multifamily residential housing rental properties, by the market's nature, any new entrant would have to comply with the various and complex governmental regulations. Compliance with the regulations is ongoing and requires consistent awareness and attention.

**Demand for Multifamily Residential Housing Rentals Is Inelastic**

57. "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "elastic" if an increase in the price of a product results in diminished revenues, with declines in the quantity sold of that product outweighing the effects of higher prices. For products with a highly elastic demand, customers have many feasible alternatives for cheaper products of similar quality, and cut purchases sharply in the face of even a small price increase.

58. For a cartel to profit from raising prices above competitive levels, market demand must be relatively less elastic at competitive prices where an increase in price would result in a net increase in profit. A less elastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and sufficient lost sales revenues as to offset the beneficial effect of higher prices on profits for products they still continue to sell.

59.     Multifamily residential housing rental leases are highly inelastic.  This is because such rentals are often for extended periods of time and because there are fewer options for renters to choose from in short order.  In other words, renters are less likely to move out if rent prices increase because staying is significantly less difficult and costly for them than finding another place to live (both in terms of out-of-pocket costs and time costs), in addition to the fact that moving residences presents substantial disruption to renters' daily lives.

**The Multifamily Residential Housing Rental Market Is Highly Concentrated**

60.     The market for multifamily residential housing rental is highly concentrated.  This is because a small number of large property management and other companies, like defendants here, own or control a materially significant number of the multifamily residential housing rental properties in the United States, meaning that there are fewer options for renters and less competition among landlords.

**Opportunity to Collude**

61.     As detailed herein, participating Lessors, directly through RealPage, share competitively sensitive information with each other.  Participating Lessors provide RealPage with non-public multifamily residential housing rental property and lease data, which is compiled and analyzed by RealPage, who then reports that information to participating Lessors to facilitate the alleged wrongdoing herein, including RealPage's price-setting and lease renewal-staggering services, and participant discipline policies.  None of these anticompetitive activities could be undertaken utilizing solely public, non-competitively sensitive sources.

62.     RealPage and participating Lessors have many opportunities to work together through online user groups, regular in-person and virtual meetings, and through trade associations.  For example, approximately one thousand participating Lessors engage with each other through a RealPage-provided and operated private User Group Forum.  This user group seeks "to improve

communications between RealPage and the user [Lessor] community," while also "promot[ing] communication between users [Lessors]" themselves. RealPage's User Group Forum facilitates Lessors submitting their own recommendations concerning RealPage's services through its "Idea Exchange."

63. RealPage also organizes in-person and virtual events and collaboration among participating Lessors. RealPage invites certain Lessors to serve on a "steering committee," which liaises with certain subcommittees of the RealPage User Group Forum to ascertain Lessors' suggestions for RealPage's software offerings and with the explicit instruction to consider "the mutual benefit of all users." RealPage also organizes an annual event called "RealWorld," where Lessors gather along with approved partners and executives from RealPage to network and exchange insights into key initiatives in the industry and practices for best utilizing RealPage tools. Over the past five years, those conferences have been held in Las Vegas, Nevada, Nashville, Tennesee, and Orlando, Florida. During the COVID-19 pandemic, those conferences were held virtually.

64. In addition, RealPage holds periodic "summits" at which participants, including Lessors, discuss with RealPage and with one another RealPage's services and analytics. Subjects discussed include: (i) "Competitive Rent Analysis" or "[m]ethods of establishing and maintaining amenity-based prices for each unit and floor plan, factoring in comparable peer pricing"; (ii) "Supply Forecast" and "Demand Forecast"; and (iii) RealPage's "Pricing Engine" or "[m]ethods to price units in real time based on statistically validated price elasticity models."

65. RealPage and participating Lessors also have additional opportunities to collude through industry trade associations. As an illustrative example, the National Multifamily Housing Council ("NMHC") – which touts itself as "the place where the leaders of the apartment industry come together to guide their future success" – holds several industry events every year, including, in

addition to annual and seasonal meetings, an in-person "Apartment Strategies Conference." These meetings have taken place in cities that include San Diego, Las Vegas, and Orlando. RealPage is a substantial sponsor of NMHC events as a "Chair's Circle Sponsor[]." Other participants in defendants' scheme also sponsor NMHC events. Significantly, NMHC "tracks market conditions through NMHC member surveys as well as data from data provider partners," to provide "industry benchmarks" on topics including "In Place Rent Per Square Foot," "Rent Change – New Leases," and "Rent Change – Renewals."

66.     The above-described conduct provided a mechanism and venue through which the conspiracy was facilitated, implemented, and monitored.

**RealPage's Market Manipulation Scheme Has Raised Governmental Scrutiny**

67.     As reported in the October 14, 2022 *ProPublica* "Rent Going Up?" article under the heading "Concerns About Competition":

> RealPage's software has gained traction at a time when the Biden administration, concerned about rising prices and corporate concentration, is looking to bolster enforcement of rules meant to ensure competition is flourishing.
>
> To win cases, antitrust prosecutors have traditionally needed to show that competitors agreed among themselves to tamper with pricing. "***If competitors agreed among themselves to use the same algorithm and to share information among themselves with the purpose of stabilizing pricing, that would be per se illegal***," said Stucke, the former antitrust prosecutor.
>
> *     *     *
>
> But Maureen K. Ohlhausen, who was then the acting chair of the Federal Trade Commission, said in a 2017 talk that it could be problematic if a group of competitors all used the same outside firm's algorithm to maximize prices across a market.
>
> She suggested substituting "a guy named Bob" everywhere the word algorithm appears.
>
> "Is it OK for a guy named Bob to collect confidential price strategy information from all the participants in a market and then tell everybody how they should price?" she said. "***If it isn't OK for a guy named Bob to do it, then it probably isn't OK for an algorithm to do it either***."

Emphasis added.

68.     Defendants' scheme has also raised concern in the U.S. Senate. Amy Klobuchar, who chairs the Senate Subcommittee on Competition Policy, Antitrust, and Consumer Rights, sent a correspondence to the U.S. Department of Justice's ("DOJ") Antitrust Division on November 4, 2022:

> We write to ask that the Antitrust Division investigate recent allegations of anticompetitive collusion leading to significant increases in rents for apartments.
>
> As recently reported, software offered by ***RealPage uses pricing algorithms to adjust prices on vacant apartments in real time***. The software analyzes non-public data that RealPage gathers from its property management clients, including confidential information on the rents charged by competing property managers, data it also makes available to its subscribers in aggregated, anonymized form. The program may also induce landlords to charge the rents recommended by the algorithm, putting upward pressure on prices and decreasing the availability of affordable apartments.
>
> ***We are concerned that the use of this rate setting software essentially amounts to a cartel to artificially inflate rental rates in multifamily residential buildings***. In addition, we are concerned about potential anticompetitive coordination taking place through the RealPage User Group, a forum of over 1,000 RealPage clients that work together on a variety of subjects, including revenue management and screening.
>
> ***The conduct in these markets raises significant anticompetitive concerns***. We are aware that the Division has taken an aggressive posture in assessing and investigating potential anticompetitive conduct, including considering how algorithms could facilitate collusion in novel ways. We encourage you to continue that work and take appropriate action to protect renters and competition in residential rental markets.

Emphasis added; footnotes omitted.

69.     Similarly, on November 14, 2022, members of the U.S. House of Representatives sent correspondence to the DOJ and the Federal Trade Commission ("FTC") requesting investigation of RealPage's rent-setting algorithm and practices:

> We are writing to urge you to investigate potential anticompetitive practices by RealPage Inc., a multinational company that provides real estate owners and managers with rent-setting software.

*     *     *

A recent investigation by ProPublica found that RealPage is using its amalgamation of rental data in coordination with its clients – property managers from across the country – in a manner that may violate the antitrust laws. According to ProPublica, **RealPage collects "its clients' internal rent data," plugs that data into its proprietary YieldStar software that "deploys an algorithm – a set of mathematical rules – to analyze a trove of data RealPage gathers from clients, including private information on what nearby competitors charge," and then "uses data analytics to suggest daily prices for open units**."

Some experts argue that landlords' knowing sharing of nonpublic data with RealPage for use in its algorithm could rise to the level of **coordinated pricing among competitors**. . . .

The ProPublica investigation found that RealPage clients regularly charge above-market rental rates, and 90 percent of property managers and landlords follow the price increases recommended by the software. This revelation, coupled with the high concentration of rental property ownership in cities across the country, suggest that RealPage and its clients' use of YieldStar could be contributing to skyrocketing rents across the United States. For example, in one Seattle neighborhood, just ten property managers oversee 70 percent of the apartments in the neighborhood – and all of them use YieldStar. According to ProPublica, one RealPage client said that its buildings "outperformed their markets by 4.8 percent," and a RealPage executive bragged that YieldStar "pushes you to go places that you wouldn't have gone if you weren't using it."

*     *     *

**Our constituents cannot afford to have anticompetitive – and potentially per se illegal – practices drive up prices** for essential goods and services at a time when a full-time, minimum-wage salary does not provide a worker enough money to rent a two-bedroom apartment in any city across this country. In America today, 1 in 5 renters pay over half of their income on housing, and the share of Americans who rent is on the rise. Rent inflation is also a major driver of overall inflation, with the September Consumer Price Index (CPI) report revealing that rent rose 7.2 percent year-over-year – the highest rate in 40 years.

The situation is even worse for new leases. In March 2022, the median rent for a new lease was up 18 percent over the previous year nationally. Some areas of the country are seeing even higher rental increases. Chicago and Boston are seeing over 20 percent rent price increases year-over-year, and some cities have seen rents rise as high as 43 percent since March 2020.

Meanwhile, corporate landlords are raking in profits. The ten largest publicly traded apartment companies reported profits soaring by 57 percent to nearly $5 billion in 2021.

- 22 -

The rental affordability crisis in the United States is increasingly dire for Americans. The Federal Trade Commission and the Department of Justice have a responsibility to ensure anticompetitive practices are not contributing to already exorbitant rent costs for everyday people, and we respectfully ask that you open an investigation into RealPage.

Footnotes omitted; emphasis added.

70. The November 14 letter also alerted the DOJ and FTC that:

"One of YieldStar's main architects" is Jeffrey Roper, a "business executive who ha[s] personal experience with . . . antitrust prosecution" for his role as "Alaska Airlines' director of revenue management when it and other major airlines began developing price-setting software in the 1980s." As explained by ProPublica, "competing airlines began using common software to share planned routes and prices with each other before they became public," which the Department of Justice later alleged "helped head off price wars that would have lowered ticket prices," thereby costing customers "more than a billion dollars between 1988 and 1992." Ultimately, in 1994, the Department of Justice settled antitrust enforcement actions against the nation's largest airlines for this conduct, identifying over 50 separate price-fixing agreements facilitated by the software. As then-Assistant Attorney General for the Antitrust Division, Anne K. Bingaman, stated: "The airlines used the [software] to carry on conversations just as direct and detailed as those traditionally conducted, by conspirators over the telephone or in hotel rooms. *Although their method was novel, their conduct amounted to price fixing, plain and simple*."

Footnotes omitted; emphasis added.

71. Thus, based on the above, RealPage has knowingly undertaken the anticompetitive conduct detailed herein. Further, in reference to the airline pricing conspiracy, while Jeffrey Roper admits that "[w]e all got called up before the Department of Justice . . . *because we were colluding*," he also claims at the time that he "had no idea" it was illegal.[2] That claimed ignorance, however – feigned or otherwise – can't reasonably be asserted today after his having been previously caught and prosecuted under those circumstances before now bringing equally unlawful similar coordination and pricing collusion to multifamily residential housing rental market competitors.

---

[2]    Emphasis added.

72.     Following these disclosures, the DOJ opened an investigation into RealPage's activities.

73.     Recently on March 2, 2023, members of the U.S. Senate corresponded with the DOJ's Antitrust Division, indicating that they had "opened an investigation" in November 2022 and written to RealPage "requesting information on how this rent-setting software has affected the rental housing market."  The letter describes how, in response:

> RealPage provided important information about the extent to which the company facilitates information sharing by and among large institutional landlords – a particular concern given the market share of the product.  The company's response indicated that "YieldStar uses a proprietary algorithm to make recommendations to apartment providers about setting a price for rental units at their property," and that "the YieldStar software is fundamentally built on the disruptive idea that a property's internal supply and demand dynamics are much more important than external factors, such as rents offered by other properties."

The Senators also state that "[RealPage] indicates that although much of its algorithm is based on publicly available sources, it also has access to and uses proprietary data in the rent-recommendation process."  Specifically, RealPage responded:

> "*With respect to generating a range of rents, YieldStar relies on a variety of data sources for rents at other properties*, including public sources, such as rents listed on apartment provider websites.  While rents for other properties that are used to generate a range are gathered largely from publicly available information, *YieldStar supplements these rents with data, where available, on achieved effective rents based on executed leases*.

74.     The Senators then go on to state:

> Although the company did not inform us about the precise extent to which this non-public data *is used, this could be a particular problem given the company's market share*.  In fact, *given YieldStar's market share, even the widespread use of its anonymized and aggregated proprietary rental data by the country's largest landlords could result in de-facto price-setting* by those companies, driving up prices and hurting renters.  This is particularly disturbing given that increases in shelter costs accounted for about half of the increase in the Consumer Price Index in January 2023, with rent increasing 8.6 percent from last year.

Emphasis added; footnotes omitted.

## CLASS ALLEGATIONS

75.     Plaintiffs bring this Action individually and on behalf of all others similarly situated

pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representatives of the

Class, which is defined as follows:

> Nationwide Class.  All persons and entities in the United States and its territories that
> are direct purchasers of multifamily residential real estate leases from a Lessor
> participating in RealPage's pricing and/or lease renewal-staggering software
> programs, or from a division, subsidiary, predecessor, agent, or affiliate of such
> Lessor, at any time during the period of October 18, 2018 through the present day
> (the "Class Period").[3]

76.     Numerosity.  The Class is so numerous that joinder of all members in this Action is

impracticable.  There are at least tens of thousands of members in the proposed Class who, like

plaintiffs, were injured by defendants' unlawful conduct.

77.     Typicality.  Plaintiffs' claims are typical of those of the Class.  Plaintiffs and all

members of the Class were all injured by the same unlawful conduct, which resulted in all of them

paying more for multifamily residential leases than they otherwise would have in a normal,

competitive market.

78.     Predominance.  Questions of law and fact common to the members of the Class will

predominate over questions, if any, that may be individual to individual Class members, since

defendants have acted and refused to act on grounds generally applicable to the Class.

79.     Questions of law and fact common to the Class include:

(a)     whether defendants have entered into a formal or informal contract,

combination, conspiracy, or common understanding to artificially inflate price and/or artificially

suppress supply of  multifamily residential real estate leases;

---

[3]     Federal and state government entities are excluded from the Class.

(b)      if defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates §1 of the Sherman Antitrust Act, 15 U.S.C. §1, under the *per se*, quick look, or rule of reason modes of analysis;

(c)      if defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated prices and/or artificially suppressed supply;

(d)      the proper measure of damages; and

(e)      the contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

80.      Adequacy.  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.  Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of plaintiffs are not antagonistic to the Class.

81.      Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this Action.

## COUNT

### Agreement in Restraint of Trade in Violation of §1 of the Sherman Antitrust Act

82.      Plaintiffs repeat and reallege all previous allegations as if fully set forth herein.

83.    Defendants have formed a cartel to artificially inflate the price of and artificially decrease the supply and output of multifamily residential real estate leases from competitive levels.

84.    Defendants' cartel has caused the Class to suffer over-charge damages.

85.    There are no procompetitive justifications for defendants' cartel, and any proffered justifications, to the extent legitimate, could be achieved through less-restrictive means.

86.    Defendants' cartel is unlawful under a *per se* mode of analysis.  In the alternative, defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, individually and on behalf of the Class of all others similarly situated, respectfully request judgment against defendants as follows:

A.    The Court determine that this Action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this Action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed in violation of §1 of the Sherman Antitrust Act, 15 U.S.C. §1;

C.    Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable laws, and that joint and several judgments in favor of plaintiffs and the members of the Class be entered against defendants in an amount to be trebled to the extent such laws permit;

D.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the alliance or any conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company information;

F.      Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.      Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      Plaintiffs and the members of the Class have such other and further relief, including injunctive relief, as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED:  April 26 , 2023

BARRET JOHNSTON MARTIN
  & GARRISON, PLLC
JERRY E. MARTIN (BPR # 20193)
PAUL J. BRUNO (BPR # 17275)
DAVID W. GARRISON (BPR # 24968)
NICOLE A. CHANIN (BPR # 40239)


    /s/ Jerry E. Martin
_____
JERRY E. MARTIN

414 Union Street, Suite 900
Nashville, TN 37219
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com
pbruno@barrettjohnston.com
dgarrison@barrettjohnston.com
nchanin@barrettjohnston.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD
HENRY S. BATOR
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DAVID W. MITCHELL
ASHLEY M. KELLY
ARTHUR L. SHINGLER III
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
AELISH M. BAIG
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
STUART A. DAVIDSON
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHAD JOHNSON
DESIREE CUMMINGS
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100

Attorneys for Plaintiffs